UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANTE TOWNS

        Plaintiff,

                                   Civil Case No. 13-12043

v.                                Honorable Linda V. Parker

MITSUBISHI ELECTRIC
AUTOMOTIVE AMERICA, INC.

        Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On May 8, 2013, Plaintiff Dante Towns ("Mr. Towns") initiated this lawsuit against his former employer, Defendant Mitsubishi Electric Automotive America, Inc. ("Mitsubishi") alleging race discrimination and retaliation in violation of federal and Michigan law.  Specifically, in his Complaint, Plaintiff alleges the following claims: (I) race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (II) race discrimination in violation of Michigan's Elliot-Larsen Civil Rights Act (or "ELCRA"); (III) retaliation in violation of Title VII; and (IV) retaliation in violation of ELCRA.  Presently before the Court is Mitsubishi's motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56 on May 16, 2014.  The motion has been fully briefed.

On May 28, 2014, the Honorable Robert H. Cleland reassigned this lawsuit to the undersigned pursuant to Administrative Order 14-AO-030.  This Court held a hearing with respect to Mitsubishi's motion on August 27, 2014.

## I.     Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323.  Once the movant meets this burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). To demonstrate a genuine issue, the

nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II.    Factual and Procedural Background

Mr. Towns is African-American. (Compl. ¶ 8.) He began working for Mitsubishi on November 12, 1990. (Def.'s Mot., Ex. 1 at 22.) In 1996, he was promoted to the position of "Warehouse Person 2", a job he then held for fifteen years. (*Id*. at 66.) In this position, Mr. Town's job duties included shipping and receiving; shipping correspondence; FedEx and UPS; conducting inventory and distributing parts to various departments and assigning parts to various locations within the warehouse. (*Id*. at 65-66.) On occasion, Mr. Towns' supervisor or someone else would ask him to do additional tasks throughout the course of a day

3

or a week.  (*Id*.)

From 1997 until 2001, Mr. Towns reported directly to Scott Lennig, the Supervisor of Field Service Operations.  (*Id*., Ex. 3 at 12.)  Mr. Towns' performance reviews during this period were generally favorable.  (*Id*., Ex. 1 at 25.)  In a portion of his 1999 performance review, Mr. Lennig stated that Mr. Towns had a history of not following directions and Mr. Towns disagreed with that assessment.  (*Id*. at 25-26.)  Mr. Towns, however, did not discuss or complain about the evaluation to anyone other than a co-worker.  (*Id*. at 26-27.)  Mr. Towns acknowledged during his deposition in this matter that he felt Mr. Lennig's evaluations of him after 1999 were accurate and fair.  (*Id*. at 28.)

Mr. Towns testified at his deposition that Mr. Lennig harassed him by asking him to pick-up packages throughout the building rather than having other employees bring their packages to him, as previously done.  (*Id*. at 58-59.)  During his deposition, Mr. Lennig testified that he instituted this change because he felt it would save Mr. Towns time.  (Def.'s Mot., Ex. 3 at 67-68.)  Previously, co-workers would bring parts to Mr. Towns and he would be required to package them and then go into the FedEx and UPS systems and print a shipping label.  (*Id*.)  With the change, each person had to package their part, print their own FedEx or UPS label, and then put the package in a drop off location for Mr. Towns to

4

retrieve.  (*Id*.)  According to Mr. Lennig, before this change was implemented, Mr. Towns complained that co-workers bringing him parts to ship would interrupt his work and stand next to him and wait for him to package parts.  (*Id*. at 68-69.)  Mr. Towns contended that Mr. Lennig also harassed him by giving him more work and not compensating him appropriately.  (*Id*., Ex. 1 at 57.)

In a letter to Group President Mike Delano at Mitsubishi dated October 11, 2010, Mr. Towns complained about his wages.  (Pl.'s Resp., Ex. 5.)  Mr. Towns expressed frustration with his wages remaining low despite being with Mitsubishi for twenty years.  (*Id*.)  He claimed that he had been "over looked" by the manager and supervisor in his department.  (*Id*.)  Mr. Towns wrote that he did not understand why Mr. Lennig was keeping his grade level so low and not changing his title, when he felt he was doing a very good job, was a team player, and was independently doing his work and solving his problems.  (*Id*.)

In his letter, Mr. Towns referred to an incident where Mr. Lennig saw a picture of Mr. Towns' then-fiancé (now his wife), who is Caucasian, and remarked "Dante must be paying for that."  (*Id*.)  During his deposition, Mr. Towns testified that Mr. Lennig made this comment outside his presence sometime in 2009, and that a co-worker, Lawrence Thompson, told him about it.  (Def.'s Mot., Ex. 1 at 94-95.)  Mr. Towns also claimed in this letter that, while Mr. Towns was on

5

disability, to Mr. Lennig asked a co-worker: "Did Dante scrap any of the pallets?"

(Pl.'s Resp., Ex. 5.)  Mr. Towns asserted that Mr. Lennig "has a problem with me

and I want to know WHY!"  (*Id*., emphasis in original.)  Nowhere in the document,

however, does Mr. Towns state or suggest that he believes the alleged mistreatment

or misconduct was due or related to his race.  (*Id*.)

Pursuant to a company reorganization in 2011, Mr. Towns became a

"Warehouse Customer Service Representative."  (Def.'s Mot., Ex. 1 at 80-81.)  Mr.

Towns' duties changed because he was doing logistics, approving cycle counts,

and adjusting cycle counts.  (*Id*. at 81.)  He also started doing another employee's

receiving job task and was shipping dealer direct shipments.  (*Id*.)  Mr. Towns

acknowledges that other employees' job duties changed as well as part of this

reorganization.  (*Id*.)  The reorganization had been discussed at several meetings

which Mr. Towns attended.  (*Id*. at 82.)  During these meetings, employees

discussed greater efficiency of job functions and employees were reassigned and

picked up new job duties to get the work done better and more efficiently.  (*Id*. at

82-83.)  Mr. Towns nevertheless doubted the reasons behind the reorganization

because "more work [was] put on [him]" that "other associates didn't want to do."

(*Id*. at 83.)

Mr. Towns believed this was improper because he was busy and, therefore,

6

it would "slip[ his] mind to go upstairs . . . to pick up [the FedEx and UPS] packages." (*Id*. at 59.) He felt that employees should bring packages to him for packing or shipping because having to retrieve them added to his workload and took away time from his primary responsibilities in the warehouse where he would pack and load pallets of materials for shipping. (Pl.'s Resp., Ex. 6 ¶ 2.)

In 2012, Robert Sutherby began supervising Mr. Towns. (Def.'s Mot., Ex. 1 at 69-70.) In an e-mail dated August 7, 2012, Mr. Towns informed Chris Gerdes, Vice President Corporation Administration, that he was taking a leave of absence "due to high stress by the department that [he is] currently in." (*Id*., Ex. 17.) Mr. Gerdes' job duties include conducting occasional investigations of employee complaints. (*Id*., Ex. 18 at 5-6.) Mr. Gerdes spoke with Mr. Towns by telephone for approximately fifty-five minutes the day after receiving his e-mail. (*Id*., Ex. 19.) Mr. Gerdes and HR Supervisor Cheryl Crawford then met with Mr. Towns and his wife on August 13 to obtain more information about Mr. Towns' concerns. (Def.'s Mot., Ex. 18 at 22-23.) During these conversations, Mr. Towns outlined incidents where he felt mistreated and/or harassed at work.

Mr. Gerdes and Ms. Crawford then investigated Mr. Towns' complaints, speaking to the individuals involved and possible witnesses. (*Id*., Ex. 19.) Mr. Gerdes prepared a summary that outlined Mr. Towns' complaints, the information

Mr. Gerdes and Ms. Crawford obtained during their investigation, and their

findings.  (*Id.* at 27; Ex. 19.)  To summarize, Mr. Towns complaints concerned the

following:

> •Mr. Lennig's comment upon seeing the picture of Mr. Towns' fiancé
> (now wife) that "He must be paying for that!"

> •Mr Towns' assertion that Mr. Baron harassed him in February 2012
> by moving his work station to where all other warehouse department
> associates work.

> •An incident where Mr. Baron disassembled a table Mr. Towns used
> and took a picture of the work area, including trash bags on the floor,
> and told Mr. Towns to clean it up.

> •An incident where Mr. Sutherby asked Mr. Towns to investigate
> details about a FedEx package that had been sent; and when Mr.
> Towns sent an e-mail to the Detroit associates seeking details, he
> criticized Mr. Towns, writing that he (Mr. Sutherby) could have sent
> an e-mail to everyone himself.

> •Mr. Towns' claim that Mr. Baron and Mr. Sutherby "nitpick" his
> work area, for example by instructing Mr. Towns to remove two of
> three garbage bags of old bubble wrap from his work area to make it
> look neater.

> •Mr. Towns' assertion that Mr. Baron sent an e-mail to Ernestine
> Brunsen while Mr. Baron was in Japan, asking her to contact the
> service centers and inform them that she would be the new contact for
> them in place of Mr. Towns, but instructing her not to inform Mr.
> Towns of this change.

> •Mr. Baron's criticism of the way Mr. Towns photographed the return
> process, as asked to do, when he subsequently praised Mr. Sutherby
> who, according to Mr. Towns, did the exact same thing as Mr. Towns.

8

•Mr. Towns' frustration with being instructed to learn another employee's job to back up the employee during his absence; but having no one trained to back up Mr. Towns so that when he returns from time off, he does not have a lot of work waiting to be done.

•Mr. Towns' complaint that the "DETO3" location is not working correctly, thus requiring him to perform a lot of manual work.

•Mr. Sutherby's failure to address Mr. Towns directly, rather than sending e-mails, when they sit in the same office area. Mr. Towns claims that Mr. Sutherby speaks with Bob Jones frequently rather than relying on e-mail.

•An incident where Mr. Towns and Ernestine Brunsen disagreed about the availability of a part. Mr. Towns insisted there was one available; Ms. Brunsen was showing none available. Mr. Baron then stated, "So, there's a parts inventory issue" and, according to Mr. Towns, began harassing him by saying that he is responsible for DET03 inventory and should know the situation and inquired what the corrective action is going to be. Mr. Towns complained that Mr. Baron continued to harass him asking, "Why? I need more information." One piece then was found in inventory and Mr. Towns felt vindicated.

•Mr. Towns complained that for over eight years, he worked "in harms way" because he pulled and packed units in a main warehouse area where there is hi-lo truck traffic.

•Mr. Towns claimed that his work area had changed several times over the years for "personal" reasons.

(*Id*., Ex. 19.)

Mr. Gerdes and Ms. Crawford found what they viewed to be reasoned explanations for almost all of the actions about which Mr. Towns complained, or they concluded that his understanding of the events was not accurate. (*Id*.) For

example, with respect to Mr. Towns' complaints about his supervisors' "nitpick[ing]" his work area, this was consistent with the "five S" method followed at Mitsubishi and Mr. Gerdes and Mr. Crawford heard from other employees that they faced similar scrutiny from these supervisors.[1]  (*Id*.)  They also found that Mr. Towns' work station had been moved for business reasons and never personal ones.  (*Id*.)  His work location was moved on the first occasion to add over three hundred new pallet locations to the warehouse, on another occasion to improve the overall process or flow of work, and more recently because his supervisor wanted the whole warehouse team working together in one area.  (*Id*.)  With respect to Ms. Brunsen replacing Mr. Towns as the contact for the service centers, Mr. Gerdes and Ms. Crawford found that Mr. Towns was present at the meetings where this change was discussed and that Mr. Baron never sent an e-mail to Ms. Brunsen

---

[1]"Five S" refers to a workplace organization method that uses a list of five Japanese words: seiri, seiton, seiso, seiketsu, and shitsuke. *See* http://en.wikipedia.org/wiki/5S_(methodology).  Transliterated or translated into English, they all start with the letter "S": sort, straighten or streamline, shine, standardize, sustain.  *Id*. The list describes how to organize a work space for efficiency and effectiveness by identifying and storing the items used, maintaining the area and items, and sustaining the new order.  *Id*.  Mr. Towns testified that he implemented the five S's, typed it out in its simplest form so all associates could understand it, and that the approach was in place at Mitsubishi before Mr. Sutherby was employed there.  (Def.'s Mot., Ex. 1 at 113-14.)  Mr. Towns summarized the five S's as "keeping everything clean" and "[w]hatever you don't use, you dispose of it. If it's non-conforming, throw it away."  (*Id*. at 114.)

while he was abroad concerning this change.[2]  They found that other changes with

respect to Mr. Towns' duties and work location were instituted in direct response

to *his* complaints about his current duties and location (e.g., the assignment to pick

up packages rather than having them delivered to Mr. Towns).  They concluded

that Mr. Lennig's comment upon seeing the picture of Mr. Town's wife was

inappropriate; however, they found that it was a one time occurrence and did not

appear to be of a sexually harassing nature or racially motivated.  (*Id*.)

Mr. Gerdes and Ms. Crawford met with Mr. Towns on September 5, 2012, to

discuss their findings from their investigation of his complaints.  (*Id*., Ex. 19 at

Towns000629.)  They told Mr. Towns that they found each of his complaints to be

without merit and not of a discriminatory or harassing nature.  (*Id*.)  At the

conclusion of their meeting, Mr. Towns indicated that he understood and hoped to

be returning to work in the near future.  (*Id*.)

Following their meeting, however, Mr. Towns sent an e-mail to Mr. Gerdes

in which he expressed that Mr. Gerdes was "twisting all of [his] issues" and that he

"felt worse."  (Pl.'s Resp., Ex. 14.)  Mr. Towns indicated that he wanted to be

---

[2]Mr. Towns contends that his job duties also were changed in 2011;
however, the evidence reflects that these changes were part of a general
reorganization pursuant to which other people had job changes as well.  (Def.'s
Mot., Ex. 1 at 81.)  Mr. Towns was present at meetings when the reorganization
was discussed.  (*Id*. at 82.)

11

moved to the R&D Building, and he requested a change to his wages and title. (*Id*.)  Mr. Towns also asserted that Mr. Gerdes and Ms. Crawford failed to interview two individuals as part of their investigation that he specifically identified as having knowledge relevant to his complaints: Cathy Jackson and Curtis Rellinger.  (Pl.'s Resp. Exs. 12, 13.)

It is not apparent what Ms. Jackson would add to Mr. Towns' claims, as no evidence from her is submitted in support of Mr. Towns' response to Defendants' summary judgment motion.  Mr. Towns offers Mr. Rellinger's deposition transcript in support of his response brief.  During his deposition, Mr. Rellinger confirmed that Mr. Towns complained to him about some of the things Mr. Towns shared with Mr. Gerdes and Ms. Crawford.  (*See, e.g.* Pl.'s Resp., Ex. 27 at 19.) Mr. Rellinger also testified that he believed Mr. Towns was "one of the guys that always kept things quite neat and organized."  (*Id*. at 33.)  However Mr. Rellinger, who is Caucasian, also testified that Mr. Baron was always pushing to keep the place clean and gave him a hard time on several occasions.  (*Id*. at 19-20, 21.)  Mr. Rellinger explained that Mr. Baron would go out at night and take pictures to show employees that what they were doing was not correct; and that Mr. Rellinger, in fact, received pictures via e-mail from Mr. Baron at least a half dozen times concerning the neatness of his workspace.  (*Id*. at 21.)

Mr. Gerdes sent an e-mail to Mr. Towns on September 14, 2012, indicating that the company would not be making the requested changes to his work station or pay level.  (Defs.' Mot., Ex. 20.)  Mr. Gerdes wrote: "As you hopefully take on more responsibility and exhibit good performance in the future, you may be considered for promotional opportunities that may come available; however, that will be determined at the time those opportunities come available."  (*Id*.)  He further wrote that there is no position currently available in the R&D Building.  (*Id*.)

Mr. Towns returned from his leave of absence in mid-October 2012.  (Defs.' Mot., Ex. 16 at 5.)  At that time, he remained in the same position but was moved from DET03 to DET01.[3]  (Defs.' Mot., Ex. 1 at 87-88; Ex. 15.)  Mr. Towns previously had complained that DET03 was inefficient as a result of not being computerized like other departments and that he felt physically unsafe working in DET03 because of the hi-lo traffic.  (*Id.* at 79-80, 87-88.)  Mr. Towns did not suffer a loss of pay or benefits and his job title did not change as a result of this

_____

[3]At the Detroit facility where Mr. Towns worked, there were three areas: DET01, DET02, and DET03.  DET01 is production, dealing with customers and shipping to the production plants; DET02 is engineer samples; and DET03 is service and warranty parts.  (*See* Defs.' Mot., Ex. 6 at 18-19.)  Each of the three areas ships and receives.  (*Id*. at 19.)  In DET03, some of the process is manual because of how parts are received from Japan.  (*Id*.)

13

transfer. (*Id*. at 88.) Cathy Jackson was assigned to DET03 and given Mr. Towns' former job responsibilities. (*Id*. at 89.) However, by that time, the DET03 warranty claims had decreased to the point that the time needed to perform Mr. Towns' previous DET03 job duties had decreased from full time to requiring only four to six hours a week. (Defs.' Mot., Ex. 6 at 101.) Mr. Towns complained that the transfer was a demotion. Mr. Sutherby responded that it was not a demotion, but a good opportunity to expand and learn new things and help out with everything else. (*Id*. at 97.) The decision to move Mr. Towns to DET01 had been made prior to his leave of absence as part of plan to ensure that department employees were sufficiently proficient with the job responsibilities in each section of the warehouse and to accommodate for the reduced DET03 work. (Defs.' Mot., Ex. 16 at 5 & Att. E.)

On November 8, 2012, about a month after returning to work, Mr. Towns took another medical leave of absence. (*Id*., Ex. 13.) Mr. Towns claimed that he needed leave "due to high stress and anxiety from [his] department." (*Id*.) Ms. Crawford approved Mr. Towns' leave. (*Id*.) In a letter dated February 12, 2013, however, Mitsubishi informed Mr. Towns that he had exhausted his leave under the Family Medical Leave Act on November 22, 2012, and that his personal medical leave would expire on February 28, 2013. (Defs.' Mot., Ex. 2.)

14

Mitsubishi warned Mr. Towns that if he was not able to return to work by that date, he would be administratively terminated. (*Id*.)

Mr. Towns acknowledges receiving this letter. (Defs.' Mot., Ex. 1 at 60-61.) He does not dispute its accuracy. (*Id*.) Apparently Mr. Towns did not return to work by February 28, 2013, and Mitsubishi terminated his employment on that date. (Compl. ¶ 21.) Mr. Towns testified that he has no reason to believe that he was terminated for any reason other than the expiration of his leave of absence. (Defs.' Mot., Ex. 1 at 61.) Although not asserted in his Complaint, Mr. Towns claims in response to Defendants' summary judgment motion that he was constructively discharged due to a hostile work environment. He did testify at his deposition that he could not return to work because of a hostile environment. (*Id*. at 35.)

Mr. Towns had filed a claim of discrimination with the Equal Employment Opportunity Commission on November 6, 2012, two days before taking his final leave of absence. (Compl. ¶ 9.) He received a Right to Sue letter on or about February 9, 2013. (*Id*. ¶ 10.) He filed this lawsuit within ninety days, on May 8, 2013.

## III.    Applicable Law and Analysis

### A.    Hostile Work Environment

Title VII of the Civil Rights Act of 1964 and Michigan's Elliot-Larsen Civil Rights Act prohibit an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment" based on that individual's race. 42 U.S.C. § 2000e–2(a)(1); Mich. Comp. Laws § 37.2202.  Discrimination so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment" violates Title VII and ELCRA. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Kalich v. AT & T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012).

Mr. Towns claims that he was subjected to a hostile work environment which eventually led to his constructive discharge.  In order to establish a prima facie case of hostile work environment based on race under ELCRA or Title VII, Mr. Towns must establish the following: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) there exists some basis for liability on the part of Mitsubishi. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir.1999); *Haynie v. Michigan Dep't of State*

16

*Police*, 664 N.W.2d 129, 133 (Mich. 2003) (citations omitted). Mitsubishi argues that Mr. Towns can establish only the first element of his prima face case because he lacks evidence to show that he was subject to harassment based on his race, that any harassment was sufficiently severe to create a hostile work environment, or that Mitsubishi was informed of any harassment that it failed to address.

Mr. Towns fails to show that any alleged harassment was based on his race. Only discriminatory harassment is actionable under Title VII and ELCRA. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (explaining that "it is important to distinguish between harassment and discriminatory harassment in order to 'ensure that Title VII does not become a general civility code.' ")). "Harassment is based on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not be overtly racist to qualify." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007)).  To show that the harassment was based on race, the plaintiff may show "either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75,

17

80-81 (1998)).  "The factfinder must evaluate the conduct at issue by both an objective and subjective standard."  *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)).

Mr. Towns offers no evidence that anyone at Mitsubishi used race-specific or derogatory terms or treated him differently than his non-African-American co-workers.  Mr. Towns contends that he was treated differently than non-African-American co-workers, specifically by Mr. Baron.  The evidence shows, however, that Mr. Baron treated Mr. Towns no differently than other Mitsubishi employees under his supervision.  For example, Mr. Rellinger, who is Caucasian, testified that Mr. Baron sent him at least a half dozen pictures of his work area with directions to clean it up.  Mr. Rellinger also described incidents where he felt mistreated or belittled by Mr. Baron.  Mr. Towns describes other incidents where he felt harassed; however, the circumstances surrounding each incident (e.g. the removal of a work table and movement of his work area) demonstrate that they did not occur because of Mr. Towns' race and/or did not affect only him.

The fact that a supervisor may be rude, arrogant, mean, or difficult to please does not establish a hostile work environment. As the Seventh Circuit aptly explained:

18

> [Title VII] does not guarantee a utopian workplace, or even a pleasant one. If the workplace is unsavory for any reason other than hostility generated on the basis of race, gender, ethnicity, or religion, no federal claim is implicated. In short, personality conflicts between employees are not the business of the federal courts.

*Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994). Thus even severe or pervasive harassment by a supervisor does not establish a claim under Title VII or ELCRA unless the harassment is based on the plaintiff's membership in a protected class.

Mr. Towns now claims that Mr. Lennig's comment upon seeing the picture of Mr. Town's wife was racist. Mr. Towns previously claimed– at least within Mitsubishi– only that he believed the comment was sexual in nature. Regardless, this one incident alone is not sufficiently severe to create a hostile work environment. *See, e.g., Bowie v. Advanced Ceramics Corp.*, 72 F. App'x 258, 264 (6th Cir. 2003) (finding that a single incident involving a racially derogatory e-mail sent by a co-worker to the plaintiff was insufficient to establish a hostile work environment).

A hostile work environment arises only "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. Isolated incidents, unless

19

extremely serious, do not amount to discriminatory changes in the terms or conditions of employment. *Id*.

In short, the Court cannot describe the treatment Mr. Towns claims he endured at Mitsubishi as severe or pervasive harassment. Even if the Court concluded that it was, however, it finds no basis to conclude that the harassment was motivated by his race. Thus the Court does not agree with Mr. Towns that Mitsubishi "disaggregates the hostile environment experienced by [him]." (*See* Pl.'s Resp. Br. at 2.) There are no harassing incidents shown to be based on Plaintiff's race to aggregate. As such, Mr. Towns fails to present evidence to demonstrate that he was subjected to a hostile work environment.

### B.   Race Discrimination

An employee may establish a claim of discrimination under Title VII and ELCRA by offering either direct or circumstantial evidence of discrimination. *White v. Columbus Metro. Hous. Auth.*, 424 F.3d 232, 238 (6th Cir. 2005) (Title VII); *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 192 (Mich. 2003) (ELCRA). Mr. Towns lacks direct evidence to show that he was subjected to an adverse action due to his race. Thus he must offer circumstantial evidence to prove his case.

When a plaintiff proves his case through circumstantial evidence, he begins

20

by establishing a prima facie case of discrimination.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).  To make this showing, the plaintiff must establish the following: "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees."  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citations omitted). If the plaintiff establishes such a prima facie case, an inference or rebuttable presumption of discrimination arises.  *DiCarlo*, 358 F.3d at 414.

In order to rebut this inference, the employer must "articulate some legitimate, non-discriminatory reason" for its conduct.  *Id*.  If the employer articulates such a reason, "'the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"  *Id*. at 414-15 (quoting *Burdine*, 450 U.S. at 253).

Mitsubishi argues that Mr. Towns cannot establish a prima facie case of race discrimination because he cannot show that he was subjected to an adverse employment action.  The Sixth Circuit has provided the following description for

21

identifying "an adverse employment action":

> [A] materially adverse change in the terms and conditions of
> employment must be more disruptive than a mere inconvenience or an
> alteration of job responsibilities. A materially adverse change might
> be indicated by a termination of employment, a demotion evidenced
> by a decrease in wage or salary, a less distinguished title, a material
> loss of benefits, significantly diminished material responsibilities, or
> other indices that might be unique to a particular situation.

*Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999) (quoting *Crady v.*

*Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)).  An

employee's responsibilities may be "different" without being "adverse."  *See*

*Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (discussing

*Crady*, where the plaintiff "had been transferred from one division of a bank to

another, but simply failed to offer any proof that his responsibilities were any less

significant even though they were different.")

In addition to the harassment addressed in the preceding section, Mr. Towns

identifies the following "adverse" employment actions that he endured:

> not receiving pay that was commensurate with his responsibilities and
> was less than Caucasian employees in similar positions and/or areas...;
> not being promoted (in pay, grade, or title) . . .; and being reassigned
> to a new area that he did not request and having his responsibilities
> significantly reduced and removed ...

(Pl.'s Resp. Br. at 12.)  With respect to his pay, Mr. Towns claims that Cathy

Jackson, a Caucasian female, and Bob Jones, a Caucasian male, earned more than

he did.

To show that he was paid less on account of his race, Mr. Towns must first make a prima facie showing that Mitsubishi paid different wages to a non-African-American employee "for work on jobs the performance of which require equal skill, effort and responsibility, and which are performed under similar working conditions." *Korte v. Diemer*, 909 F.2d 954, 958 (6th Cir. 1990) (internal quotation marks and citation omitted) (also explaining that "[t]he analysis of a claim of unequal pay for equal work is essentially the same under both the Equal Pay Act and Title VII).  Mr. Towns indicates that Ms. Jackson and Mr. Jones also work in the warehouse area, but he offers no other basis on which to determine whether they are appropriate comparators.  In fact during his deposition in this matter, Mr. Towns conceded that he knows nothing about either co-worker's background, education, qualifications, training, or pay history.  (Defs.' Mot., Ex. 1 at 140-43.) He apparently has not amassed evidence with respect to these factors during discovery to show that these co-workers were similarly situated to him, as he does not offer such evidence in response to Mitsubishi's motion.  Nor does Mr. Towns show that these employees performed work on jobs equal to his in skill, effort, or responsibility.  Mitsubishi, however,  presents evidence demonstrating that these co-workers were not similarly situated to Mr. Towns.

23

Mr. Towns relies on the fact that Mr. Jones and Ms. Jackson also worked in the warehouse.  Mr. Jones, however, was the team lead.  He had been employed with Mitsubishi for over twenty-eight years and performed duties not performed by Mr. Towns.  (Defs.' Mot., Ex 16 at 5.)  Ms. Jackson had been demoted to a warehouse customer service representative position from a supervisory position in another department without a reduction in her wages. (*Id*.) Mitsubishi provides an analysis of the wages of all warehouse employees which reflects that Mr. Towns' hourly pay rate was above the average by 4.7% and was at 98.9% of the median pay for all non-exempt workers at that facility.  (*Id*.; *see also* Att. C.)  Except for Mr. Jones and Ms. Jackson, Mr. Towns was paid an hourly rate higher than all warehouse employees, including a Caucasian employee.  (*Id*.)  In short, Mr. Towns fails to show that he was paid less than a comparable non-African-American employee.

Mr. Towns similarly offers a dearth of evidence to support his claim that he suffered a demotion.  He does not allege that he suffered a reduction in pay or benefits; rather, he complains that he was reassigned to different work areas and that his DET03 work duties were taken away and given to a Caucasian employee. (Pl.'s Resp. Br. at 6.)

With respect to the movement of his work area, "[t]he case law . . . indicates

24

that an employee's transfer may constitute a materially adverse employment action, even in the absence of a demotion or pay decrease, so long as the particular circumstances present give rise to some level of objective intolerability." *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 919 (6th Cir. 2014).  In *Deleon*, the plaintiff was transferred to a position which exposed him "to toxic and hazardous diesel fumes on a daily basis . . . he had to wipe soot out of his office on a weekly basis [and] . . . [he] claim[ed] that he contracted bronchitis, had frequent sinus headaches, and would occasionally blow black soot out of his nostrils."  *Id*. at 919-20. In *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Supreme Court determined that a jury might reasonably conclude that reassignment to a less prestigious, "more arduous and dirtier" job qualifies as a materially adverse action notwithstanding the fact that "the former and present duties fall within the same job description." *Id*. at 71.  There is no evidence that the changes in Mr. Towns' work location resulted in materially adverse changes to his job comparable to those experienced by the plaintiffs in *Deleon* or *White*. Moreover, he was moved on one occasion in response to *his* complaints about the safety of his work area location and the lack of computerization in that area which required him to engage in excessive manual work.  Mr. Towns' DET03 job duties were reassigned to Ms. Jackson, but as part of a company-wide reorganization of

all employees and to address the diminished work in DET03.  Additionally, Mr.

Towns received other duties in lieu of those transferred to Ms. Jackson which in no

way are suggested to have made his job more adverse or intolerable.  As the Sixth

Circuit has advised, "[r]eassignments without changes in salary, benefits, title, or

work hours usually do not constitute adverse employment actions." *Policastro v.*

*Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002).

Mr. Towns therefore fails to demonstrate an adverse action or adverse

treatment to support his discrimination claims.

### C.     Retaliation

Title VII and ELCRA prohibit retaliation against employees who complain

about discrimination. 42 U.S.C. § 2000e-3(a); Mich. Comp. Laws § 37.2701.

Absent direct evidence of a retaliatory purpose, the familiar burden-shifting

framework articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792

(1973), governs claims of retaliation brought under both statutes. *Ladd v. Grand*

*Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009) (Title VII); *Meyer v. City of*

*Ctr. Line*, 619 N.W.2d 182, 188 (Mich. Ct. App. 2000) (ELCRA).  First, the

plaintiff must establish a prima facie case of retaliation, which has four elements:

(1) the plaintiff engaged in activity protected by Title VII [or ELCRA]; (2) the

defendant knew about the plaintiff's exercise of this right; (3) the defendant took

26

an employment action adverse to the plaintiff; and (4) the protected activity and the adverse employment action are causally connected. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (Title VII); *Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 653 ( Mich. 2005) (listing same elements in ELCRA retaliation analysis).  Under Title VII, the plaintiff must show that his protected activity "was a but-for cause of the alleged adverse action by the employer."  *Univ. of Tex. SW Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).  Similarly, under ELCRA, the employee's protected activity must be a "significant factor" in the employer's adverse employment action.  *Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001).

Mitsubishi argues that Mr. Towns' retaliation claims fail because he cannot show that he suffered an adverse employment action, much less one casually connected to any protected activity that he took.[4]  In fact during his deposition, when asked whether he had any reason to believe that he was terminated for any

------

[4]Mitsubishi questions whether Mr. Towns engaged in protected activity before filing his EEOC complaint, because to constitute protected activity, an employee must indicate that the complained of conduct occurred because of the employee's race.  *See Offt v. Warren Cnty. Reg'l Jail*, 109 F. App'x 740, 743 (6th Cir 2004). Mr. Towns did not raise the issue of race discrimination when he complained within Mitsubishi and the Court does not believe that a reasonable employer would infer that Mr. Towns was complaining of race discrimination. Nevertheless, the Court will assume that Mr. Towns engaged in protected conduct before filing his EEOC complaint for purposes of evaluating his claims.

reason other than the expiration of his leave of absence, Mr. Towns answered

"No."  (Defs.' Mot., Ex. 1 at 61.)  Notwithstanding his claims of retaliation, for the

reasons discussed above, Mr. Towns fails to present evidence suggesting that he

otherwise suffered an adverse employment action.  Mitsubishi therefore is also

entitled to summary judgment on Mr. Towns' retaliation claims.

## IV.    Conclusion

In summary, the Court concludes that Mr. Towns fails to present evidence to

create a genuine issue of material fact relevant to his hostile work environment,

race discrimination, and retaliation claims.   Overall, there is insufficient proof of

harassment or discrimination related to Mr. Towns' race or adverse conduct against

Mr. Towns by Mitsubishi.

Accordingly,

**IT IS ORDERED**, that Defendant Mitsubishi Electric Automotive America,

Inc.'s motion for summary judgment is **GRANTED**.

S/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: February 5, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of
record and/or pro se parties on this date, February 5, 2015, by electronic and/or

U.S. First Class mail.

S/ Richard Loury
Case Manager